UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

TRB ACQUISITIONS LLC and E.D.Y. EQUITIES LLC,

Plaintiffs,

-against-

JACK YEDID,

Defendant.

**Case No.** 20-CV-552

**COMPLAINT**

**Jury Trial Demanded**

Plaintiffs TRB Acquisitions LLC ("TRB") and E.D.Y. Equities LLC ("E.D.Y.") (collectively, "Plaintiffs"), by their undersigned attorneys, for their complaint against defendant Jack Yedid ("Jack Yedid" or "Defendant"), allege as follows:

## PRELIMINARY STATEMENT

1. This is an action to recover significant financial losses that Plaintiffs have suffered due to Defendant's scheme to extort Plaintiffs—which violated the Defend Trade Secrets Act of 2016, as well as multiple state laws—in an attempt to gain leverage in a bitter arbitration pending between Jack Yedid, on the one hand, and his brother Eli Yedid and his father, on the other hand.

2. E.D.Y. (a company wholly owned by Eli Yedid) and Jack Yedid formerly were co-owners of TRB, a company that was managed by Eli Yedid and which acquired and licensed certain trademarks for apparel and accessories.

3. In 2015, TRB was sued by adidas/Reebok ("Reebok") in the U.S. District Court for the District of Oregon for trademark infringement, unfair competition, and related claims (the "Reebok Litigation"). Primarily at issue in the Reebok Litigation was whether TRB's "RBX"

trademarks and logo (the "RBX Trademarks") infringed on certain trademarks owned by Reebok, including registered marks for "Reebok" and "RBK," and whether TRB's affirmative defense of laches barred Reebok's claims.

4. In 2016, E.D.Y. bought out Jack Yedid's ownership interest in TRB. In connection with that transaction, Jack Yedid agreed to broad confidentiality and non-disparagement obligations with respect to TRB and its business operations, which supplemented the duties of loyalty and confidentiality that Jack Yedid owed generally to TRB.

5. Separately, Eli Yedid and Jack Yedid owned stakes in another company, Cutie Pie Baby, Inc. ("CPB"), which also was a named defendant in the Reebok Litigation as a then licensee of the RBX Trademarks.

6. In 2019, Jack Yedid commenced an arbitration against Eli Yedid and other CPB stakeholders over various disputes between Eli Yedid and Jack Yedid regarding the management of CPB (the "CPB Arbitration").

7. Oved & Oved LLP ("Oved") is counsel of record for Jack Yedid in the CPB Arbitration, which remains pending.

8. As will be described further herein, in connection with a scheme to pressure Eli Yedid to pay Jack Yedid eight million dollars ($8,000,000) in order to resolve the CPB Arbitration, Jack Yedid and Oved threatened to provide information to Reebok that would be damaging to TRB (and thus ultimately harmful to E.D.Y. and Eli Yedid as owners of TRB) in the Reebok Litigation.

9. Specifically, both Jack Yedid and Oved expressly warned Eli Yedid and his counsel, respectively, that if Eli Yedid did not "pay up" in the CPB Arbitration, then Jack Yedid would materially harm Eli Yedid in the Reebok Litigation. For example, Jack Yedid and Oved

threatened that Jack Yedid would provide damaging information to the plaintiffs in the Reebok Litigation, namely, that as part of TRB's marketing strategy, Eli Yedid intentionally acquired and used the RBX Trademarks in a manner that was infringing on Reebok.

10. Of course, Jack Yedid knew that his threatened testimony for Reebok—that Eli Yedid was aware of the potentially infringing nature of the RBX Trademarks at the time TRB acquired them but nevertheless used those trademarks in bad faith—would compromise TRB's defenses in the Reebok Litigation.

11. Although portions of it were false, Jack Yedid's threatened testimony nonetheless included trade secret and other confidential information concerning TRB's strategy for going to market, including, at a minimum, information relating to brand strategy, plans to create and/or discontinue certain trademark licenses, and strategies and plans for competing in certain markets.

12. Jack Yedid learned such information as a result of his position as a co-owner of TRB and owed a duty to keep confidential TRB's trade secret and other confidential information.

13. Additionally, such information was squarely within the scope of the confidentiality agreement by which Jack Yedid was bound following his separation from TRB.

14. When Eli Yedid refused to accede to Defendant's extortion attempts, Jack Yedid and Oved took concrete steps to follow through on their threats.

15. First, "anonymous" phone calls were made to counsel for Reebok stating that Jack Yedid possessed information that was very damaging to TRB in the Reebok Litigation, namely, that TRB "intended to copy Reebok from the get-go."

16. Based upon the information in the "anonymous" calls, Reebok filed a motion to reopen discovery and take Jack Yedid's deposition.

17. In connection with that motion, it was revealed that Oved made an unsolicited phone call to lead counsel for Reebok and that Oved subsequently advised Reebok's counsel that Jack Yedid would comply with a subpoena issued to him if the court in the Reebok Litigation authorized his deposition.

18. Oved did so without any prior notice to, or consultation with, TRB's or CPB's attorneys or counsel of record in the Reebok Litigation.

19. In spite of the motion to reopen discovery being denied, Jack Yedid and Oved continued their communications with Reebok's counsel.

20. Reebok thereafter listed Jack Yedid as one of Reebok's trial lay witnesses, with Oved's accepting a trial subpoena on Jack Yedid's behalf even though Jack Yedid could not be compelled to testify in the Reebok Litigation.

21. Reebok also included a detailed description of Jack Yedid's testimony that indicated Jack Yedid had breached his duties of loyalty and confidentiality, as well as his contractual obligations, by disclosing TRB's marketing strategy to Reebok, and had further made statements to Reebok concerning the precise contours of that marketing strategy.

22. As a result of these actions and Jack Yedid's apparent willingness to lie under oath to damage Plaintiffs and Eli Yedid, TRB settled the Reebok Litigation on terms that would not have been necessary but for Defendant's wrongful conduct.

23. Plaintiffs now bring this action to hold Defendant accountable for his multiple violations of law.

## PARTIES

24. Plaintiff TRB Acquisitions LLC is a New York limited liability company, with its principal place of business at 34 West 33rd Street, 5th Floor, New York, New York 10001.

25. Plaintiff E.D.Y. Equities LLC is a New York limited liability company, with its principal place of business at 34 West 33rd Street, 5th Floor, New York, New York 10001.

26. Defendant Jack Yedid is a natural person and a resident of the State of New York.

## JURISDICTION AND VENUE

27. The Court has original jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that it raises a federal question under the Defend Trade Secrets Act of 2016, Pub. L. No. 114-153, 18 U.S.C. § 1836 (the "DTSA"), as well as pursuant to 28 U.S.C. §§ 1337(a) in that it arises under an Act of Congress regulating commerce (i.e., the DTSA).

28. The Court has supplemental jurisdiction over the state law claims pursuant to 28 U.S.C. § 1367.

29. Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391(b).

30. The Court has personal jurisdiction over Defendant pursuant to N.Y. C.P.L.R. § 301.

## FACTUAL ALLEGATIONS

### Jack Yedid's Buy-Out from TRB, His Associated Confidentiality and Non-Disparagement Obligations, and the Reebok Litigation

31. Jack Yedid was an original co-owner of TRB, which acquired the RBX Trademarks in 2011.

32. The RBX Trademarks had been used in connection with the sale and marketing of apparel and accessories from as early as 2005 to 2011, and were in use at the time that TRB acquired them.

33. TRB is a competitor of Reebok. Indeed, clothing and accessories branded with TRB's RBX Trademarks compete with similar goods sold by Reebok or under Reebok's brand name.

34. In November 2015, Reebok commenced the Reebok Litigation, asserting various trademark infringement claims arising from the use of the RBX Trademarks.

35. One of TRB's central defenses in the Reebok Litigation was that Reebok's claims were barred by laches, i.e., that Reebok sat on its hands and failed to assert its claims in a timely fashion, to the prejudice of TRB.

36. In June 2016, pursuant to an Assignment and Acceptance of Membership Interests Agreement (the "TRB Agreement"), E.D.Y. bought out Jack Yedid's ownership interests in TRB for two million, one hundred fifty-eight thousand, two hundred and four dollars ($2,158,204).

37. Jack Yedid was bound by the TRB Agreement to maintain as confidential "certain confidential and/or proprietary information concerning" TRB's (as well as TRB's managers', officers', directors', shareholders', members', and other representatives') businesses, "including, but not limited to":

> (a) intellectual property, procedures, formulae, processes, techniques, specifications and know-how; (b) trade secrets; (c) financial information; (d) any other business information, including operations, business plans, methods, products, information regarding threatened or pending litigation (including without limitation the [Reebok Litigation]; and (f) third-party information, including information relating to customers (including licensees and their respective customers), partners, investors, lenders, suppliers and agents ("Confidential Information").

Jack Yedid's obligations under the TRB Agreement with respect to maintaining the confidentiality of the foregoing information were as follows:

> If Confidential Information is required to be produced by law, court order, or other governmental demand, Assignor [Jack Yedid] shall, to the extent

> permitted by the applicable law, promptly notify TRB of that obligation prior to such disclosure.
>
> Assignor hereby represents and warrants that it shall not, at any time hereafter, use or disclose any Confidential Information in a manner not authorized by TRB in writing. Confidential Information may only be disseminated to the Assignor's employees, officers, owners, attorneys and accountants ("Authorized Personnel") that (a) Assignor reasonably determines need to know the Confidential Information for a valid purpose concerning Assignor's association with TRB; and (b) are bound by written confidentiality obligations or ethical duties. Assignor shall be responsible for any breach of the terms and conditions of this Agreement by any Authorized Personnel who receive Confidential Information.

38. The foregoing contractual obligations were in addition to Jack Yedid's common law duty to maintain as confidential all information regarding TRB's business, which stem from his implied duty of loyalty to TRB based on his former co-ownership of the company.

39. Jack Yedid was further obligated under the TRB Agreement not to "make to any third party any disparaging written or oral statement regarding TRB, or otherwise take any action, which could reasonably be expected to adversely affect the reputation of TRB."

**<u>The CPB Arbitration and Oved's Involvement in Defendant's Scheme to Extort Plaintiffs and Eli Yedid</u>**

40. In December 2018, Jack Yedid was suspended (with pay) from CPB pending an investigation into certain suspicious activity by Jack Yedid.

41. During the investigation, CPB discovered that Jack Yedid had orchestrated an "upcharge" and kickback embezzlement scheme.

42. Jack Yedid was subsequently terminated from his employment with CPB.

43. For more than a month thereafter, Jack Yedid, Eli Yedid, and other stakeholders in CPB attempted to negotiate a resolution with respect to Jack Yedid's permanent separation from CPB.

44. During those negotiations, and at future points in time, Jack Yedid made threats that if he was not paid the outrageous figure he was demanding, he would seek to harm Eli Yedid and TRB (and thus E.D.Y.) by providing allegedly harmful information to Reebok that would compromise TRB's defense in the Reebok Litigation.

45. In or around January 2019, Jack Yedid retained Oved as legal counsel.

46. On February 5, 2019, Jack Yedid initiated the CPB Arbitration, with Oved as its counsel, through which Jack Yedid sought, among other things, the dissolution of CPB.

47. All conduct of attorneys of the Oved law firm described in this Complaint is alleged to have been carried out within the scope of their authority as agents for Jack Yedid and at Jack Yedid's direction and/or ratification. As such, Jack Yedid is liable for their conduct.

48. In connection with the CPB Arbitration, Jack Yedid brought an emergency motion for injunctive relief seeking, inter alia, immediate reinstatement as an officer and director of CPB.

49. The emergency arbitrator appointed for the R-38 emergency motion scheduled a limited hearing on February 28, 2019, on the narrow issue of whether Jack Yedid could demonstrate "irreparable injury" to himself or CPB if Jack Yedid was not immediately reinstated as an officer and director of CPB pending the outcome of the arbitration.

50. On the morning of the emergency hearing, before the hearing started, Terrance Oved from the Oved law firm asked to speak privately with outside general counsel for Eli Yedid and CPB ("CPB's General Counsel").

51. Before the conversation began in earnest, Terrance Oved aggressively pointed his finger in CPB's General Counsel's chest and demanded to know whether the conversation was being recorded.

52. After being assured that he was not being recorded, Terrance Oved proceeded to tell CPB's General Counsel that if Eli Yedid did not settle the arbitration on the terms demanded by Jack Yedid, then Jack Yedid would testify on the record at the emergency hearing to matters that would harm Eli Yedid and TRB (and thus E.D.Y.) in the Reebok Litigation.

53. Later that morning, and again before the hearing started, Jack Yedid doubled-down on this extortion attempt in a separate conversation with Eli Yedid, telling Eli Yedid that he wanted eight million dollars ($8,000,000) to resolve the CPB Arbitration and that he would "do anything he had to do," including "going to Reebok," to get his $8 million.

54. When CPB's General Counsel and Eli Yedid rejected Defendant's demands, Oved's Aaron Solomon sought to elicit testimony from Jack Yedid during the emergency hearing—over multiple objections from counsel for Eli Yedid and CPB that the testimony was irrelevant to the matters at issue in the CPB Arbitration (not to mention the scope of the limited hearing) and that Jack Yedid was prohibited from disclosing TRB's confidential information—that intended to cast a negative light on TRB's use of the RBX Trademarks.

55. For example, Jack Yedid testified as follows:

> Q. The decision to use the RBX logo in the face of what you testified was your belief it looked like the Reebok logo, whose decision was that?
>
> A. When Eli took over the company, when he took control of the management, that was clearly his objective, he ran with that.
>
> Q. He ran with it?
>
> A. He ran with it.
>
> ....
>
> Q. But your brother was concerned because you guys had been referring to or aware of the potential one might—confusion one might have between the RBX and RBK logo?

A. Yes.

56. Furthermore, Jack Yedid and Oved refused to treat any of the hearing testimony as confidential, so as to send a clear message to Eli Yedid (and thus TRB and E.D.Y.) that Jack Yedid's harmful testimony could be used against TRB, E.D.Y. and Eli Yedid if Jack Yedid was not paid off.

57. Notwithstanding, the arbitrator ruled that if Jack Yedid's testimony fell within the scope of the confidentiality provisions of the TRB Agreement, then such testimony would be deemed confidential.

58. Jack Yedid's testimony at the emergency hearing regarding TRB's use of the RBX Trademarks did, in fact, fall within the scope of the confidentiality provisions of the TRB Agreement.

59. On March 1, 2019—the day following the emergency hearing in the CPB Arbitration—CPB's General Counsel emailed Terrance Oved and provided him with a copy of the TRB Agreement and specifically called his attention to the confidentiality and non-disparagement provisions.

**Jack Yedid's and Oved's Coordination with Reebok's Counsel, Breaches of the TRB Agreement, and Resulting Settlement of the Reebok Litigation on Terms Unfavorable to TRB**

60. Frustrated by Eli Yedid's continued refusal to capitulate to Jack Yedid's demands in the CPB Arbitration, Jack Yedid and Oved eventually made good on Jack Yedid's threats to try to sabotage TRB's defense in the Reebok Litigation.

61. According to declarations filed by Reebok's attorneys in the Reebok Litigation (the "Reebok Declarations"), in May 2019, one of Reebok's attorneys received a call that was generated "from an automated voice system that reads text messages as phone calls." The

computerized voice on the call stated that TRB's owner, Eli Yedid, and his brother, Jack, were in a dispute with regard to the "family business" and urged Reebok to "get in contact with him [Jack]."

62. Based on the unique nature of the communication, and the lack of detail provided by the computerized voice call, Reebok's attorneys dismissed the call.

63. Then, on June 28, 2019, Reebok's lead counsel received another anonymous call—this time without being disguised by an automated voice system that reads text messages as phone calls—from a man claiming to have information that would be helpful to Reebok in the Reebok Litigation. The "anonymous" caller informed Reebok's counsel that he knew Jack Yedid, that Jack Yedid "was a part of TRB," and that Jack Yedid was aware that TRB "intended to copy Reebok from the get-go."

64. The "anonymous" caller further advised Reebok's counsel that Reebok would need to subpoena Jack Yedid because there was a contract that prevented him from freely disclosing certain information. The "anonymous" caller then provided Reebok's counsel with a cell phone number that was said to be Jack Yedid's and encouraged him to call the number.

65. Upon information and belief, Jack Yedid and/or Oved either orchestrated or at least were aware of and complicit in the automated phone call to one of Reebok's attorneys in May 2019 and the "anonymous" phone call to Reebok's lead counsel on June 28, 2019.

66. The Reebok Declarations went on to state that on July 11, 2019, Reebok's lead counsel received an unsolicited call from two Oved attorneys who were representing Jack Yedid—Darren Oved and Edward Wipper.

67. Although the Reebok Declarations did not explain why the Oved attorneys made the unsolicited call, Oved plainly was acting on Jack Yedid's behalf to assist Reebok's attorneys

in the Reebok Litigation—and purposely creating the public appearance of coordination with Reebok's attorneys—as part and parcel of Defendant's extortion scheme to gain leverage in the CPB Arbitration as against Eli Yedid

68. Based upon the information in the "anonymous" calls, Reebok filed a motion in the Reebok Litigation seeking to reopen discovery to take Jack Yedid's deposition.

69. Thereafter, on August 12, 2019, Edward Wipper (of the Oved law firm) advised Reebok's lead counsel "that if this Court authorizes a deposition and a subpoena is issued to Jack Yedid, Mr. Yedid will comply with the subpoena and sit for a deposition."

70. Oved made this concession without any prior notice to, or consultation with, TRB's or CPB's attorneys or counsel of record in the Reebok Litigation, and despite the fact that any such putative subpoena on Jack Yedid could have been challenged on several meritorious grounds to quash.

71. Despite the fact that the motion to reopen discovery in the Reebok Litigation was denied, Oved thereafter continued to communicate with Reebok's counsel, and Jack Yedid and Oved provided further assistance to Reebok in the Reebok Litigation, including by purposely creating the public appearance of coordination with Reebok's attorneys.

72. On September 11, 2019, Oved agreed to accept service on behalf of Jack Yedid of a trial subpoena from Reebok to provide trial testimony (in Portland, Oregon) during the Reebok Litigation.

73. In other words, Jack Yedid and Oved made clear Jack Yedid's intention to testify voluntarily at a trial that he otherwise could not have been compelled to testify at given that the trial was venued in Oregon and Jack Yedid is a resident of New York.

74. Reebok subsequently listed Jack Yedid as one of Reebok's trial lay witnesses. Reebok included a detailed description of Jack Yedid's proposed testimony that indicated he had breached his duties of loyalty and confidentiality, as well as his contractual obligations, by disclosing TRB's marketing strategy to Reebok, and had further made statements to Reebok concerning the precise contours of that marketing strategy.

75. In Reebok's pre-trial witness statement filed in the Reebok Litigation, Jack Yedid's anticipated testimony was described as follows:

> Jack Yedid is a part-owner and member of defendants TRB Acquisitions LLC (i.e., TRB) and Cutie Pie Baby ("CPB"). He also is an officer of CPB, formerly serving as its President. He also is the brother of Eli Yedid, the majority owner of TRB.
>
> Mr. Yedid will testify concerning TRB and CPB's bad faith intent to create a brand that would be confused with Reebok and would be positioned as a "knockoff" Reebok brand. He also will offer testimony concerning the fact that TRB and Eli Yedid did not intend to continue the brand identity (or product lines or channels of trade) of The Rugged Bear Company; rather, Eli Yedid's purpose of acquiring the RBX Mark in Rugged Bear's bankruptcy was to own a trademark that was confusingly similar to Reebok's trademarks and to then greatly expand the use of that mark in new channels and in new markets across the United States. Mr. Yedid will also testify concerning instances of actual confusion of which Eli Yedid, TRB, and CPB all had actual knowledge.

76. The foregoing demonstrates that either Jack Yedid, Oved, or (more likely) both (and/or other agents acting on Jack Yedid's behalf) had communications with Reebok's attorneys about the substance of Jack Yedid's anticipated testimony.

77. Indeed, during settlement discussions between counsel for TRB and Reebok, counsel for Reebok admitted that Oved was cooperating with Reebok's counsel in the Reebok Litigation and asserted that their communications were subject to an oral "common interest" agreement between the parties.

78. On December 6, 2019, during a telephone call with, among others, CPB's General Counsel, Edward Wipper denied any "common interest" agreement existed between Jack Yedid and Oved, on the one hand, and Rebook and its attorneys, on the other hand.

79. On December 10, 2019, CPB's General Counsel wrote to Darren Oved and Edward Wipper:

> Eddie/Darren:
>
> On last Friday's call, Eddie denied that any "common interest" agreement ever existed—oral or otherwise—between Jack Yedid/Oved law firm, on the one hand, and the adidas/Reebok plaintiffs and their attorneys (Kilpatrick Townsend), on the other hand, despite TRB's attorneys having been told of a "common interest" agreement by Kilpatrick Townsend.
>
> Please confirm your statement in writing via reply email—[i.e.], that no such "common interest" agreement ever existed—and further confirm that because you do not assert that such an agreement ever existed, Jack Yedid/Oved law firm have no objection to [Kilpatrick] Townsend sharing any information they have concerning the adidas/Reebok litigation and Jack Yedid/Oved law firm.

80. Notably, Oved has refused to respond to the December 10, 2019 email.

81. The information that was conveyed to Reebok by Jack Yedid and Oved (and/or other agents acting on Jack Yedid's behalf) constituted trade secret information about TRB's marketing strategy that, among other things, plainly fell within the scope of the TRB Agreement's confidentiality provisions. It also constituted disparaging information against TRB. The communications between Jack Yedid, Oved, and/or other agents acting on Jack Yedid's behalf and Reebok thus violated the TRB Agreement in multiple ways.

82. Faced with the fact that Jack Yedid had followed through on his threats to sabotage TRB's defenses in the Reebok Litigation, Plaintiffs here were forced to settle the Reebok Litigation on terms that would not have been necessary but for Defendant's wrongful conduct.

**FIRST CLAIM FOR RELIEF**
**Trade Secret Misappropriation – 18 U.S.C. § 1836(b)**
**(on behalf of TRB)**

83. Plaintiff TRB repeats and re-alleges the allegations set forth in paragraphs 1 through 82 as if fully set forth herein.

84. TRB is the owner of valuable trade secrets related to products and services used in, or intended for use in, interstate or foreign commerce. Such trade secrets comprise TRB's financial, business, scientific, technical, economic and engineering information, including but not limited to business plans, marketing plans, compilations, program devices, formulas, designs, prototypes, methods, techniques, processes, procedures, programs and codes, both tangible and intangible and stored, compiled and memorialized physically, electronically and graphically.

85. Among other things, such trade secrets consist of TRB's marketing and brand strategies, including plans to create and discontinue licensed product lines, and strategies and plans for competing in certain trade channels, product categories and markets.

86. TRB has taken reasonable measures to keep such information secret, including, among other things, by limiting the disclosure of such information to those needing it to perform their business duties, limiting disclosure of information to those under confidentiality obligations, and/or requiring persons privy to such information to be bound by written confidentiality agreements, such as the confidentiality provisions included within the TRB Agreement.

87. TRB's trade secrets derive independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable through proper means by, another person who can obtain economic value from the disclosure or use of the information, such as TRB's competitor Reebok.

88. Defendant and/or his agents disclosed certain of TRB's trade secrets to TRB's competitor Reebok without TRB's express or implied consent. Such trade secrets included at least TRB's marketing and brand strategies, including plans to create and discontinue licensed product lines, and strategies and plans for competing in certain trade channels, product categories and markets.

89. Defendant and/or his agents used improper means to acquire knowledge of TRB's trade secrets by breaching or inducing a breach of a duty to maintain secrecy—namely, the confidentiality obligations in the TRB Agreement and Jack Yedid's common law duties of loyalty and confidentiality.

90. Defendant and/or his agents knew or had reason to know at the time that they disclosed TRB's trade secrets that their knowledge of the trade secrets was derived from or through Jack Yedid, that Jack Yedid owed a duty to TRB to maintain the secrecy of the trade secrets or limit the use thereof, and that the disclosure breached that duty.

91. Defendant and/or his agents knew or had reason to know at the time that they disclosed TRB's trade secrets that their knowledge of the trade secrets was acquired under circumstances giving rise to a duty to maintain the secrecy of the trade secrets or limit the use thereof.

92. Defendant and/or his agents, with intent to convert trade secrets that are related to a product or service used in or intended for use in interstate or foreign commerce to the economic benefit of TRB, and intending or knowing that their actions would injure TRB, did knowingly disclose, without authorization, the trade secrets to Reebok's counsel via multiple communications between January 2019 through December 2019.

93. As a result of Defendant's misappropriation of TRB's trade secrets, TRB has suffered damages in an amount to be proved at trial.

94. Because the trade secrets were willfully and maliciously misappropriated, TRB is entitled to an award of exemplary damages and attorney's fees.

**SECOND CLAIM FOR RELIEF**
**Unfair Competition (Misappropriation) – New York Common Law**
**(on behalf of TRB)**

95. Plaintiff TRB repeats and re-alleges the allegations set forth in paragraphs 1 through 94 as if fully set forth herein.

96. Defendant misappropriated a commercial advantage belonging to TRB—namely, trade secrets or proprietary information consisting of TRB's brand strategy, plans to create and discontinue licensed product lines, and strategies and plans for competing in product categories and trade channels—by exploitation.

97. Defendant did so by willfully and maliciously breaching or inducing a breach of the TRB Agreement and Jack Yedid's common law duties of loyalty and confidentiality.

98. Specifically, Defendant and/or his agents disclosed to TRB's competitor Reebok the aforementioned trades secrets or proprietary information, in breach of the confidentiality provisions of the TRB Agreement and Jack Yedid's common law duties of loyalty and confidentiality.

99. Defendant acted in bad faith in misappropriating TRB's commercial advantage in that his only purpose in doing so was to extort money from Eli Yedid in the CPB Arbitration.

100. As a result of Defendant's unfair competition and misappropriation of TRB's trade secrets and proprietary information, TRB has suffered damages in an amount to be proved at trial.

101. Because Defendant's unfair competition and misappropriation of TRB's trade secrets and proprietary information was willful and malicious, TRB is entitled to an award of punitive damages and attorney's fees.

**THIRD CLAIM FOR RELIEF**
**Prima Facie Tort – New York Common Law**
**(on behalf of TRB and E.D.Y.)**

102. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 101 as if fully set forth herein.

103. Defendant intentionally inflicted harm on Plaintiffs by coordinating with Reebok to sabotage the defense of the Reebok Litigation.

104. Defendant's conduct resulted in special damages to Plaintiffs in that TRB was forced to settle the Reebok Litigation on terms that would not have been necessary but for Defendant's wrongful conduct.

105. Defendant acted without excuse or justification and, in light of TRB's and Eli Yedid's refusals to accede to Defendant's earlier extortion attempts, did so maliciously and for the sole purpose of injuring Plaintiffs.

106. Thus, even if Defendant's coordination with Reebok in the Reebok Litigation would otherwise be lawful, under these circumstances it rises to the level of tortious conduct for which Defendant is liable to Plaintiffs.

107. Because Defendant's unlawful conduct was willful and malicious, Plaintiffs are entitled to an award of punitive damages and attorney's fees.

**FOURTH CLAIM FOR RELIEF**
**Breach of Contract – New York Common Law**
**(on behalf of TRB and E.D.Y.)**

108. Plaintiffs repeat and re-allege the allegations set forth in paragraphs 1 through 107 as if fully set forth herein.

109. Plaintiffs have performed their obligations under the TRB Agreement.

110. Defendant is obligated under the TRB Agreement to keep various matters relating to TRB confidential, including but not limited to, trade secrets and any other business information, including operations, business plans, methods, and licensed products, as well as information regarding the Reebok Litigation.

111. Furthermore, Defendant is responsible under the TRB Agreement for any breach thereof by any person to whom Defendant disseminated confidential information.

112. Defendant is further obligated under the TRB Agreement not to make any disparaging written or oral statement regarding TRB to any third party, or otherwise take any action that could reasonably be expected to adversely affect the reputation of TRB.

113. Defendant breached the foregoing obligations by, either directly or through his agents, disclosing confidential information to Reebok, disparaging TRB to Reebok, and otherwise adversely affecting the reputation of TRB by stating to Reebok that, among other things, Plaintiffs acted in bad faith and knowingly infringed on Reebok's trademarks.

114. As a result of Defendant's multiple breaches of the TRB Agreement, Plaintiffs have suffered damages in an amount to be proved at trial but in no event less than the consideration Defendant received under the TRB Agreement, i.e., $2,158,204.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment against Defendant:

A. Awarding Plaintiffs compensatory damages and/or restitution in an amount to be determined at trial but in no event less than $2,158,204;

B. Awarding Plaintiffs punitive and exemplary damages in an amount to be determined at trial;

C. Awarding Plaintiffs costs, disbursements, and attorneys' fees in connection with this action;

D. Awarding Plaintiffs pre- and post-judgment interest; and

E. Granting such other and further relief as this Court deems just and proper.

DATED: New York, New York
January 21, 2020

STROOCK & STROOCK & LAVAN LLP

By: /s/ James L. Bernard

James L. Bernard
Daniel N. Bertaccini
180 Maiden Lane
New York, NY 10038-4982
Tel: (212) 806-5400
Fax: (212) 806-6006

*Attorneys for Plaintiffs*
*TRB Acquisitions LLC and*
*E.D.Y. Equities LLC*